Good morning, your honors. If we're ready to proceed, I am. Why don't we wait till. Okay, go ahead. I may please the court, your honors. I'm Zachary Ayers on behalf of the appellant, Jonathan Allen, in this case, and I reserve five minutes of my time for rebuttal. The four issues I want to approach the court with today, first, starting off with speedy trial, second, with the insufficiency argument, third and fourth, if time permits, the grand jury issue, and then the vouching prosecutorial misconduct and mismanagement issue. So starting with the speedy trial issue, your honors, the judge found a speedy, the district court judge found a speedy trial violation on September 29th, 2023. The issue we have with it is what was the proper remedy the district court should have provided? It is our position that the district court abused its discretion when finding a dismissal without prejudice because the court, the district court did not take into account the government's actions and conditions it created. I wanted to cut to the heart of this because it sounds like on appeal, there's no issue about the speedy trial act violation. That's basically conceded across the board. And I think you honed in on the issue, which was dismissal with prejudice or without. Is there any case that has said that the district court abused its discretion when it dismissed without prejudice? So I have not found a case in that regard. The case that I can lead the court to is the Hall case. And the Hall case, what happened in there was there was a similar type of delay where the co-defendant to Hall was continuing the case along with the government to get the cooperation of the co-defendant against Hall. We have that same thing here where the government is creating those conditions that prejudice Allen and create that delay. Counsel, you're overlooking the factual findings of the district court, which included the fact that you were burying the district court with defense pretrial motions and that you essentially acceded to the October trial date, although the district court acknowledged that it erred in not getting a confirmation of a waiver by your client. So two points to that. First, Allen himself asserted speedy trial all the way through. He opted out of the continuance, the second continuance by the co-defendants. He waived his 30-day after a superseding indictment before trial. He wanted to go to trial on June 5th. The district court was well aware of that. But what we have on with these motions is the motions were filed timely at the pretrial deadline for the original motion for some of the motion. Some of you filed one motion three days before trial. Did you not? That is correct. That was the grand jury abuse motion. And that's because we had asked the government as early as April to provide the grand jury transcripts because we suspected there was trouble with the grand jury. I think you're really missing the point of the question. If this is an abuse of discretion standard of review and you have no case saying that what the district court did here was an abuse, then at that point as an appellate court, we look down over the top and we say we got no case that says it's an abuse. And this is the way you decided to do it, so I guess we're just going to have to affirm because it isn't an abuse. And that's why my colleagues questioned Honorable Nelson. What case have you got which says that the district court was wrong should have really honed in on you? If you don't have a case, then we can argue all day about whether why you did it and when you did it and what you did is right or wrong. But the district court had the first chance to look at that. And in doing that, they made the decision they did. And you got no case saying they did it wrong. So how is it an abuse? I mean, abuse says there's a case dead on that says they were wrong. Otherwise, they've got to consider the factors. And as Judge Tallman's pointing out, they considered the factors. They went through every one of the factors, the seriousness of the offense, the facts and circumstances. That's what he's on. The impact of the re-prosecution on all of that. So the district court did all we've told them to do. They just came out a different way than you did. And you got no case against. But the point I'm making, Your Honor, is the cases that I cited, whether it's Hall. Hall is a good case, but it doesn't help you because, again, it's abuse of discretion. What it did, the subsequent history of that, Hall was sent back to the district court. And the district court had to go back through the 3162 factors. Well, at this time, the court went through the 3162 factors. And what I'm arguing is that the district court did abuse that discretion because it ignored the government presenting the conditions, such as not getting the Facebook page and having knowledge. Those are great arguments that you want to make, but you made them to the district court. And the district court looked at all the stuff in front of it, looked at all the things that went by, and, using the 3162A factors, said, hey, guess what? We're going to make this without absolute dismissal. We're going to give them another chance. And now I'm on appeal, and you want me to look over the top of that and say to him or her, that's wrong. But I got no case to say it's wrong. Well, and that sometimes can be an issue of first impression, Your Honor. Well, it's not necessarily an issue of first impression. It means on an abuse of discretion standard, it wasn't an abuse. So we move to the next issue. That's really not your best issue. Well, moving on to the next issue, Your Honors, at that point. And which is that? You want to go to the evidentiary one? Yes, Your Honor. The insufficiency of the evidence. So the government's theory of the prosecution in this case, at least starting with Counts 1 and Count 2. Count 1 was a conspiracy charge. The government's theory of prosecution there was that Fisher, Allen, and Brown conspired together to further distribute drugs to the agent. Count 2 is that theory of prosecution there is Allen aided and abetted Fisher to distribute to the agents. The thing is, is the transcripts or the testimony of Fisher and the testimony of Brown dispute that because the testimony of Brown, starting with Count 1, shows a single transaction, and along with the testimony of Fisher, a single transaction and a buyer-seller relationship. Buyer-seller relationship meaning that Brown testified he could go on a Facebook page where they were selling drugs. They were selling stolen items. All these people could communicate in this Facebook group, and then they go to a- And that was John Allen's page, right? The page that ultimately came up was the Jonathan Allen Facebook page. That's correct. With his picture on it. Yes. Which the agents matched. Two months after the fact. To your counsel sitting in the car at the scene of the first drug transaction and the second delivery of the firearm transaction. That's the guy. But on the 27th, going back to that night of the first drug transaction, and this gets to Count 2, he's not participating in trying to explain how that- Well, you're using participating in the sense that he's not having the face-to-face interchange with the undercover agent, but he's certainly present at the scene, and then we have the testimony of Fisher later in the trial that links him to being the source of supply for the drugs and the firearm. So under the- What is it? Virginia case, we have to view the evidence of light most favorable to the government under Rule 29 motion. Why is that insufficient evidence to support a rational jury verdict of proof beyond a reasonable doubt? Because when Fisher, and starting with Count 1 again, when Fisher and Brown testified, you have Brown testifying that it's a buyer-seller relationship. They could go to anyone they could. Along with Fisher testifying, he did not tell Brown or Allen what he was going to do with those drugs. There was no indication that it was going to be for future dealing by Fisher. He didn't indicate that. In the face of all of these Facebook text messages? Even then, those text messages only show a facilitation between Brown and Fisher to meet in the transaction between them. Allen didn't touch the drugs. He didn't have a financial stake in them. He didn't get the money. It's pretty clear it's a buyer-seller relationship. They're not a conspiracy. What about the firearm? The firearm is a different night. The conspiracy is charged- So you agree there's sufficient evidence to support the firearm charge? That's a weaker argument compared to the Count 1 and Count 2. Well, is that yes or no? I'm sorry? Is that yes or no? Do you concede that the evidence was sufficient to support a rational jury verdict of the firearm violation? It's pretty strong evidence. That particular one, I would concede that on Count 3. Are we talking about Plaza? I'm sorry? Are we talking about the firearm at the Plaza now? Correct. How about a casino? Would you concede that as well? Had to, Your Honor, because it's obvious and it's on video, unfortunately. But going back to Counts 1 and 2, again, I've got to bring the court back to Counts 1 and 2. In a conspiracy. Because you have a conspiracy charge. The problem you have is going- I'm driving you back to Fisher's testimony. He said Allen didn't touch it. Fisher did not communicate to Allen or Brown what he was going to do with those drugs. He could have kept them for himself. But as we go further in time, Fisher testifies that he drove Allen. He eventually tells Allen on the drive, I'm going to sell these. And Fisher explains on the stand what Allen said. And Allen said, I want to go home. I want out of the car. He doesn't want any part of it. And it's pretty clear. And when you look at the videos that I submitted that confirm that, who goes into the car with the agents? Fisher does. Who does the deal with the agents? Fisher. Allen's over here, merely present, sitting in the car. Why isn't that consistent with your client basically being the prince behind the curtain and asking his flunky to run the risk that he might be dealing with undercover federal agents or a cooperating informant in a drug deal? On the premise of the question, I would have to disagree. It's not his flunky because they didn't know each other before. He's basically asking Fisher to assume the majority of the risk. That's the thrust of my question. Couldn't a rational jury so conclude? No, Your Honor, because Fisher was doing his own drug dealing with many other people as well. And he testified to that fact. So they're not in a joint agreement together. What they're not in is having a continuing series of transactions for drugs. It's not them. Are you really presenting this evidence that we're talking about here in the light most favorable to the prosecutor? Making your argument to me today. Because the standard of review would suggest that you're going to only win if you present that evidence in the light most favorable to the prosecutor. Now, you can make all your arguments you want to, and there are many which are made to a jury. But when you're in front of me, you've got to change your argument. You've got to give the prosecutor every benefit of the doubt of the evidence and then say you win. And I don't think you've done that. You've presented your best defense argument, but you really haven't given the prosecutor the benefit of the doubt on the evidence. Well, let's walk through that, Your Honor. All right. That's what I'm trying to get you to do. The evidence that the government was trying to present at trial was the Facebook pages, the text messages, the videos, and all the audio phone calls with Fisher throughout the entire trial, including everything that we can see in light of the investigation. The posts, the messages. Yes. He responded that he had seven rips. Yeah. But here's the thing. Even though he responded he wanted all seven of the rips, he began coordinating with Brown and Fisher to get it done.  Told Fisher that he would have to come to McDonald's and get him before the deal. I mean, all of those are there. Then you've got a cooperator who says Fisher confirmed that the picture was the same person who was in the car. Even then, even then, Your Honor, with all those pieces of evidence, even then it doesn't show a conspiracy to distribute downstream to the agent because Fisher never presented that to anyone.   I understand your argument. But that's what I'm saying is even with those text messages, it doesn't show a conspiracy. It shows a single transaction. And I assume that's the argument you made to the jury. Yes. Yeah. And they didn't buy your argument. And that's why we believe the jury was unreasonable in its conclusion. Because they're convicted on the basis of that evidence? That's your argument? That's part of the argument, not the whole argument. The whole argument is. The trouble comes in the like most favorable. That's the trouble. Yeah. Because you can make your good argument. And, frankly, you've convinced me you would have made a great argument even to that jury. But I'm just saying you've got a different panel here. This isn't the jury who can be convinced by your argument. This is the panel that gives everything to the prosecutor. And then you've got to say there's nothing there. Well, that's what I'm saying. And I, frankly, don't agree with you after all of that. Well, that's what I'm saying. So go to the next issue. So the next issue, Your Honor, with time. Do we still have enough time? I believe we do. Well, you have the time. If you want to reserve. I mean, you can go to the next issue. I reserve the five minutes and a moment, Your Honor. So the last issue, time permitting, is the grand jury abuse issue. And we believe that the district court erred in its determination because there are two primary questions in the initial grand jury meeting, which we believe were perjury. And the two questions that perjured the witness.  Are there only two instances of abuse that we're talking about here? There were more in the district court, but these were the ones we wanted to focus on. These are the only ones we're really talking about? That we're really talking about here today.  I'm just making sure. Yes. And that's why I had a footnote in my brief that there were more. I did. That's what I was going to refer you to. Okay. I know where we are. Thank you, Your Honor. The two questions are, did the undercover then meet with Mr. Fisher and Mr. Allen on October 28th? Answer was yes. Did Mr. Allen provide the undercover with a 9mm handgun for sale? Answer, yes. What that implies, you cannot look at those in isolation. But what that implies is that Allen was physically or actually met and interacted with the agents. And he physically handed the gun to them. What we argued in the district court, what we're still arguing now, is that the videotapes, the reports, clearly show that Allen and the agents never met. And he never physically handed them. What is your burden of proof on this? I know my standard of view is de novo. The burden of proof was... Well, I know it's de novo, and I'm the one who's going to make it. But what's your burden of proof? Burden of proof is that it has to be... The prosecutor engaged in flagrant, and I emphasize flagrant, misconduct that deceived the grand jury and significantly impaired its ability to exercise independent judgment. Now think about what you're arguing. You're arguing that because somebody, and I have heard, said or said whatever, they didn't exactly say it the way you would want it said, which is what the district court said. They just are overemphasizing certain words. And frankly, that's not abuse. We're arguing that it was material. Oh, I know you are, but I'm just trying to say it's got to be flagrant. It's got to be deceptive. It's got to be significantly impairing. Here's where it's deceptive, Your Honor, and where we argue it's deceptive. It is telling the grand jury that Allen gave the firearm to them physically. No Fisher, nobody. It's saying he gave it to them, and he handed it to them, he met them. And when you have evidence that's completely different, that says they never met him one time. But the trial verdict shows that the jury concluded that he was the source of the drugs and the firearm and that he provided that contraband knowing that it was going to be used in a transaction with a buyer and that the transaction was illegal. In light of the jury's verdict and the grand jury's determination, based on this challenge testimony, that there was probable cause to return the indictment, where is the harm here? The harm comes in when it wasn't corrected by the prosecutor on the subsequent grand jury indictments and it was material because it implies that he met those agents, that he was the one that physically handed it to them, which is not accurate. Under an aiding and abetting theory, which is essentially what conspiracy is, he's guilty beyond a reasonable doubt, according to the Pettit jury. So I'm still, there's a disconnect in your argument between a grand jury determination of probable cause based on kind of loosey-goosey testimony that wasn't as precise as all the evidence that the government marshaled to convince the trial jury beyond a reasonable doubt that he was guilty. But the bottom line is he's convicted and the grand jury was right. There was probable cause to charge him with these offenses. I would respectfully disagree with that, Your Honor, because of the... You don't think the grand jury would have indicted if they had known all the things that the Pettit jury learned? I think if they were informed by the government about that and corrected about it, then, I mean, I would just leave the fact that they didn't correct it as the problem, ultimately. And I see my time has passed. We'll give you a couple minutes for rebuttal. Okay, thank you, Your Honor. Thank you. May I proceed? Good morning, Your Honors. David Herzog on behalf of the United States. I was also trial counsel below. Before I begin, I want to thank the court for sitting in court, Elaine. It's a big circuit. For those of us who don't live in Seattle, San Francisco, Portland, or Los Angeles, it's a great opportunity to get to let the public and law students see the court's important work. Well, we just came up to have a hearing where our good colleague lives and breathes and works. So you don't need to thank us too much. We just want to come up here by hand. I'm delighted they're here, too. I will say this, Your Honor. I'm not going to name names, but there's at least one law student here who is missing the last day of classes at Gonzaga just to be here for the argument. So I do think it's important and well-received. Well, then you better do a really good job in impressing them. I'll do my best, Your Honor. May it please the court. The evidence here was overwhelming. I think that the court has been pointing at that throughout the questioning. In addition to the text messages, the cell phone records, the recorded calls, the Facebook records, the five witnesses who identified Allen at trial, one of whom was his own sister, the undercover agent who said that's the same guy 100% the second day, and everything John Allen said in his own Facebook messages to set up and complete the drug transaction make it clear that the evidence here was overwhelming. But I will take the defendant's arguments in turn. So with regard to the dismissal without prejudice, the government argued below, to answer Judge Nelson's question about whether or not we all agree that there was no speedy trial violation, the government does not. The fact that the defense lawyer said in a conversation about when is the trial date realistic, on the Friday before the Monday trial date, on the day that motions had been filed, and the judge said, what about October 2nd, and counsel said October 2nd works for me, the United States would submit that is agreeing to the continuance. It is true that Mr. Allen pursued his speedy trial rights throughout the case. So you aren't conceding that there actually was a violation, even though the district court found there was a violation. That's correct. But here for practical, I mean I guess we could go back into that issue. Thank you for clarifying it, but really we're here on dismissal without prejudice versus dismissal with prejudice. Yeah, that's absolutely right, Your Honor. And with the dismissal without prejudice, I don't think there's any question that the district court did not abuse its discretion for the reasons the court was indicating with my friend. The three factors are seriousness of the offense, the facts leading to the dismissal, and then the impact of re-prosecution on the administration of justice. We all agree, very serious conduct. The defense concedes that. And then with regard to the facts leading to the dismissal, Judge Tallman put his finger right on it. Counsel filed a motion that day. You can either file motions and litigate, or you can proceed to trial on the first date. But if there's a conflict, you can't do both at the same time. And that's 3161H. That's the Speedy Trial Act that says until the resolution of the motion, the court shall exclude the speedy trial time. And so here, it is essentially an untenable position to file a motion and then insist on trial three days later. The court needs time. The government needs time to respond to that substantive motion. And also, as Judge Tallman notes, there were already seven outstanding motions that were orally resolved, some of them which were orally resolved on the record that day, but the written order didn't come out until after the June 5th date. Why don't we move to impact of the delay? Your opposition counsel suggests that the only reason there was any delay and the only reason you wanted delay was that it was your chance to bolster your case. How do you respond to that? Your Honor, I don't think I can do it better than the district court did, which is to say, and this is at ER 29, there is no evidence that the government intentionally delayed trial just to bolster its case, and defendant was, at least theoretically, similarly able to bolster his case during the delay. The court found for three reasons that the factors leading to the dismissal warranted dismissal without prejudice. And the first was that there was a conspiracy charge that had recently been filed. After we interviewed the lead defendant, we superseded with a conspiracy charge that was not in the original indictment. Well, those other defendants need a chance to get their defense ready too. The court noted the conspiracy charge having been filed was one of the reasons for the dismissal. Second, the court specifically found no bad faith. The government did not act in any way to delay, and the defendant filed the motion. And then the third, I think Judge Peterson got it right when she said, look, I'm not even sure this is a speedy trial violation, but my order could have been clearer. Well, if this is a technical violation like in Medina, that the basis for the 3161 continuance was there, but the court failed to articulate it. And I would submit that had the defense said at that June 2nd hearing, wait, Judge, no date in October. I am going to seek my speedy trial rights right this minute. Judge Peterson would have been on notice to make the requisite record to find an ends of justice continuance. But that's not what happened. Instead, counsel said that works for me. That date works for me. And so I would submit to the court that the facts leading to the dismissal, none of those were facts that warrant dismissal with prejudice. And in fact, did the trial take place 12 days from the dismissal? There were 12 non-excluded days, and then the actual trial took place about a month after we re-indicted. And that's another thing Judge Peterson found, which is that essentially the trial was delayed by a month after the resolution of the motions and excluded time, which didn't impact the defendant's overall administration of justice. I would submit to the court, my friend keeps referring to the Hall case, which Judge Smith notes is not on point here, in part because Hall was a delay specifically for a co-defendant to cooperate, and the district court made no record. The district court didn't even make speedy trial findings. Well, that's not what happened here. This is not a co-defendant motion. This is the defendant's motion filed three days before trial. So it's just not apposite. The case that does control, the case that resolves this issue is Medina, in which the dismissal without prejudice was found to be proper because it was a technical violation, even though that was also a co-defendant motion, in a conspiracy case, so not dissimilar from here. Also, I don't think counsel is pursuing the Sixth Amendment speedy trial claim particularly aggressively, but even so, in Medina, it was a 21-day delay, and here it's 12. But honestly, I'm not sure Medina or Hall control on an abuse of discretion, so I don't know how much argument you need to put into it. If it's an abuse of discretion and there's no case dead on point that says it's an abuse, then guess what? I'm without power, really, as long as they do the factors which you've already argued. Wouldn't you agree? I do agree, Your Honor. All right. Then I'd move on. I'll say to the court what I say to our externs. That's called a softball question. Know when to sit down. Yes, Your Honor. Then I think the next argument from the defense is the purported grand jury abuse. And here, you know, Judge Smith, I think, articulated the standard, which is from Almodarra's flagrant misconduct that deceived the grand jury or significantly impaired its ability to render, exercise independent judgment. That is just not what happened here. Even the language that my friend just cited to the court, I think he conceded, because if you're going to acknowledge that John Allen knowingly possessed a firearm at the bus plaza, well, then he certainly brought the gun to the plaza and then he provided the gun, which is the alleged perjurious statement. There's a wide delta between the interpretation of a word like met or provide and perjury. I mean, perjury is a crime. The idea that the agent couldn't say to the grand jury that Fisher, Allen, and the undercover met at Walmart when they arranged to meet at Walmart and then Fisher and Allen showed up in Fisher's car to the place in the parking lot where the undercover was. I think anybody would say that is meeting, but certainly it's not perjury for the agent to testify that they met that way. And then with regard to the provision, did Mr. Allen provide the gun on the second day, on the 28th, I refer the court to 2 ER 292. It's Fisher's testimony that Allen brought the gun in his backpack, got into Fisher's car, took the gun out with rags rather than touching it himself, gave it to Fisher to sell to the undercover. So he clearly both met and provided by any definition. And so I would just submit to the court that the idea that that is in any way perjurious or rises to the significantly high level of grand jury abuse, it doesn't hold water. Well, as to that charge, we're really arguing over whether because the officers never saw the defendant hand over the gun that he provided it for the sale. Isn't that what we're arguing about? Your Honor, I think so, but I think the record at trial clearly belies that because Fisher testified. The agents could see that Fisher and a black male that they had not yet identified as Allen were in Fisher's car. The agent testified, I saw them go in between them and wrestle with something. Fisher testified, yeah, Allen brought the gun in the backpack, and then he took out of the backpack and gave it to me, and then I sold it to the agents. That's providing the gun on the standard of the grand jury testimony from an agent who can testify to hearsay, et cetera, and be led. So I think Judge Tallman's point on this I think is the right one, which is if the pettit jury can convict on all four charges, there's no way to say that met and provide was somehow improper the way it was testified to before the grand jury at a probable cause standard. Your Honor, those are my responses to the points counsel made. I'm happy to take any questions. Can I turn you to the prosecutorial misconduct? Yes, Your Honor. Is there anything you'd want to say in response to that claim? Yes, Your Honor. I think it's meritless across the board. There are four claims of alleged prosecutorial misconduct here, and of course the – I'm not necessarily disagreeing with you that it's meritless across the board, but let me point to some of the e-mails that they cite to. You've read the e-mails that you sent. Absolutely, Your Honor. In hindsight, would you send those same e-mails again? Yes, I would, and I will tell the court why. Okay. Counsel, then let me just go this way with it. There was no misconduct here. I want to be clear. You've been very professional. Let me read one of these. This is from you. I've done – this is at ER – 14 ER 3637. I've done all I can do here. No more offers will be made, and this dude is doing at least the next 10 years in the big house. You would send that e-mail again? Your Honor, in the context of the preceding several pages of e-mails in which I went to the greatest lengths possible to help make sure that the defendant understood the exposure he was facing and giving him the ample opportunity to get out and run to that. Can I just – okay. You're not helping yourself here. Just take a gentle suggestion. I've worked for the United States. There's no greater honor than being able to come into court and say I'm here representing the United States. I've also worked for private clients. There are things I would say when I was representing a private client that I would not say when I was representing the United States. And I was hoping you'd come in and say, in hindsight, I could have worded this differently. It's not misconduct. It's not misconduct. Take your duty seriously. And I would suggest that it's not appropriate for a U.S. – somebody working and representing for the United States, when they're talking about criminal capacity, someone lose their liberty to talk about and even reference this dude is at least spending the next 10 years in the big house. Just work on the tone. Just work on the tone. Very well, Your Honor. I take the court's point. And certainly that one sentence, if I had the chance to write it again today, I would write it in a different way.  You gave me what I wanted. Let's move on. That's all that needs to be said. All right. I would also just point the court to the many other times which I complimented counsel on representation, et cetera. Counsel, I give it. I want to make clear. You've been nothing but professional in this courtroom. You offered a lot of – you handled this case with the utmost integrity. I'm not questioning that. I'm just saying remember the United States is a great – and I know you agree with that. It's a great honor. I do, Your Honor. That note is taken. Okay. If the court has no other – I just have one kind of housekeeping matter. I notice there's no Ninth Circuit law with regard to the admission of the Facebook. Would it be helpful if we published on that issue? Yes, Your Honor. It would if I may, and I think it may be helpful for the people in the room as well who maybe don't – haven't authenticated a lot of Facebook records. Right. There's almost no trial these days that does not have some social media evidence that needs to get in. And so I think perhaps this is in some ways a perfect case to publish on. This is how you get Facebook records into evidence. What I was thinking. Because the challenge is both the admissibility of the 90211 and the 40344 challenge. So if the court will permit me. Yeah, go ahead. So what a Facebook custodian of records or any custodian of records can do is say these records are our records. Mr. Herzog didn't type these up. These are actual Facebook records. They were sent from this Facebook user to this Facebook user on this date, and here is the content. Can't say whether the content is true. Can't say who the user is. Can't say whether it's relevant or admissible. Just can say these are our records. The 90211 process has existed for many, many years in order to prevent the witness who can say that housekeeping thing, these are our records, from having to fly all over the country at every trial. So we can submit a 90211 to a person knowledgeable who can say, yep, these are our records. And that is what happened here. The government obtained from Meta, Facebook, the 90211 certificate. The problem comes with our. They are authentic Facebook records. Our records, that's what he's going to question. Fair enough. They are. Your Honor, I think I would say that for purely the first step of authentication of the records, what Facebook can say is these are Facebook records. We kept them in the course of our business, which is not methamphetamine distribution but communications. It's a formal Facebook business. That's correct, yes. Because we have these people communicating with each other, and they are the ones talking, they are the ones doing, and that's why the hour makes it a little bit more worrisome. I understand the court's point. Perhaps I was not as articulate as I could have been. These are authentic Facebook communications sent on these dates between two users. The rest of it is up to the proponent. As the proponent of the evidence, once I've established that there's a reasonable probability that a jury could conclude these are what they are, it's my job to figure out how are they relevant and material under Rule 401 and not unduly prejudicial under Rule 403, that they're not hearsay, and that they are in some way moving the ball forward on relevance. With Facebook in particular, the way to do that often is the content of the messages and the subscriber information. Here, the subscriber information came back to Jonathan Allen, who went to Ferris High School in Spokane, whose birthday was February 9, 1991. There were communications where he referred to himself as Ghost, and other people referred to him as Ghost. There are references to the phone number that he used to communicate with Fisher. There are communications with his sister, Shavara, who testified at trial. The communications are about what they're going to do for Christmas. The user of the account said on February 6, my birthday is in three days, and John Allen's birthday is February 9. So the ability to tie up that, the defendant sitting in the courtroom, is the user of the Jonathan Allen Facebook. That job is the proponent's job, and we did that here, as I've just explained. Now those records have been made more relevant. Then, and that's relevance under 401, relevant and material to the case. Then, quite rightly, the court has to do, whether asked by the defense or not, to do an analysis under Rule 403. Is the evidence unduly prejudicial or outweighed by its prohibitiveness? And here, the court did that amply by making us either redact or not use thousands and thousands and thousands of messages. There were 14,000 pages in this Facebook return. The evidence we actually put in front of the jury was something like maybe 12 or 15 actual exchanges, almost all of which were then subsequently redacted to eliminate information that the court thought was unduly prejudicial, acknowledging that I inadvertently made a mistake on one of the redactions, which the court cured with an instruction. So it's the proponent's job to establish that these records, whatever they are from Facebook, are relevant because the guy sending the messages and receiving the messages is the guy sitting at the defense table. And that we then did. And the guy has disputed his identity. Yes, obviously without having to take the stand. But yes, to the extent that the defense overall disputed his identity, a big part of my job was to prove up that these Facebook messages were relevant and material because they were his. Because the drug deal took place in the Facebook messages. The exhibit that showed the conspiracy was the exhibit between Brown and Allen setting up and completing the drug deal, which they then completed with Fisher in the car. So I'll return to that in a moment. So then on a 403-404-B challenge, the court then has to also say, is there anything about this that goes to propensity? Is the government trying to get this evidence in to show this is a bad guy or he's done it before, he'll do it again? The court, in this case, did a very clear job of that by eliminating any references that could have been perceived to be anything other than evidence of the crime itself. The drug deal with Brown and Fisher, or identity. And the court gave the pettit jury specific instructions on that. You may consider for identity and to prove the crime, but not to show he's a bad guy, or the standard propensity instruction. So then we've got a hearsay issue, which is these are out-of-court statements being offered by the government to prove the truth of the drug deal. Matter asserted outside of court. Now, because I'm the government, I'm the party opponent, so I may introduce under Rule 801-D2A the defendant's own statements. So everything that John Allen said in his Facebook messages come in as a party opponent statement when offered by the government, not when offered by the defense. To the extent that I needed to show what the communications meant, I'm able to get in Brown's responses to show the context of the hearsay statements. So in that way, we avoided the hearsay problem as well, which wasn't challenged. It was not challenged as hearsay. And so having worked through the authentication from the 902.11, the relevance and admissibility by the content of the messages themselves, and also Brown testifying, yeah, that's John Allen that I was communicating with. That's the guy. And that's the Facebook that we used. Having authenticated, made it relevant material, excluded prejudicial or propensity evidence, and worked around the hearsay problem, then and only then can the jury weigh the testimony. It's for the jury to then weigh that testimony. And this is not a case, and this is why it would be helpful to publish. It is not permissible to just throw 902.11 in and say, okay, that comes in for the jury. A proponent of this evidence has to walk through each of those steps, authentication, materiality, relevance, hearsay, and prejudicial and probative, in order for the jury to get it. And when the jury gets it, then they can weigh it. And how the jury weighs is up to them. So for that reason, it would be helpful. Okay. Counsel, I think we have your argument. We've let you go over, and you've been very helpful. Thank you, Your Honor. Two minutes for rebuttal. Just a couple points, Your Honor. With the authentication issue, it's under 902.11 along with 803.6. The thing is, is the point of Facebook's business is advertising, and that's where they make their money off of. They don't, under 902.11, for that self-authentication, it was not properly self-authenticated. So your position is these are not actually business records of Facebook? Is that your argument? That is part of it. The content is what I'm saying. The content of the message. These are records that are kept in the normal course of the business's activity. How can they not be business records, even though they may be doing all this in order to generate revenue from advertising? They're not generating revenue from private messages on Facebook, not on a post or anything like that. What authority do you have to make this distinction? Because Mr. Herzog's outline of the applicability of the rules of evidence is the way I understand the law to work. It's from the Brown case in the Third Circuit, which was showing that these are not records kept. These are not the records kept for the purpose of Facebook's business, whereas advertising would be. This is drug dealing between two individuals. That's not a business of Facebook. But you're confusing the proponent's obligation or burden to establish the relevance of the contents to give the district court an opportunity to balance the prejudicial value versus the relevance and the authentication of the record, which is step one, that these are the records of a regularly conducted business activity that were made at or about the time that the activity occurred. I mean, that's black letter evidence law. But what I'm saying is the government can't get past step one on self-authentication. They would need a witness for that. Which they had through the testimony of all these. Well, in fact, I guess what the ATF agent who was able to testify that, you know, he got the screenshot that allowed him to finger Alan as the guy who was sitting in the car. Even with the screenshot, he did not fully. I mean, it is my argument that he didn't fully know who that was. Yeah, but there's other evidence that Mr. Herzog outlined in response to Judge Smith's questions that established that. But he didn't have the agent did not have familiarity with the Facebook page is what I'm getting. But he doesn't have to in order to to help the jury understand that the John Allen who owns this Facebook page is the John Allen who's seated next to you in the courtroom. You have the testimony of Ms. Shavara Ham, who testified that many different people use that Facebook page. Is your best is your best argument the case you cited from the Third Circuit? Yes, Brown. That's your best argument. Yes. All right. We've got that case well in mind. OK. OK. Thank you, Your Honor. Thank you. Thank you to both counsel. A very important case. Very much appreciate how helpful counsel's been in helping us understand the issues and and the professional way in which it was argued that conclude that case now submitted. And that concludes our arguments for the day.
judges: TALLMAN, SMITH, NELSON